We will continue argument this morning in Case 11-398, the Department of Health and Human Services v. Florida. General Riley. Mr. Chief Justice, and may it please the Court, the Affordable Care Act addresses a fundamental and enduring problem in our health care system and our economy. Insurance has become the predominant means of paying for health care in this country. For most Americans, for more than 80 percent of Americans, the insurance system does provide effective access. Excuse me. But for more than 40 million Americans who do not have access to health insurance,  such as Medicare or Medicaid, the system does not work. Those individuals must resort to the individual market, and that market does not provide affordable health insurance. It does not do so because the multibillion-dollar subsidies that are available for the employer market are not available in the individual market. It does not do so because ERISA and HIPAA regulations that preclude discrimination against people based on their medical history do not apply in the individual market. That is an economic problem, and it begets another economic problem. They can address it directly, Justice Scalia, and they are addressing it directly through this Act by regulating the means by which health care is purchased. That is the way this Act works. Under the Commerce Clause, what Congress has done is to enact reforms of the insurance market directed at the individual insurance market that preclude discrimination based on preexisting conditions that require guaranteed-issue community rating. And it uses, and the minimum coverage provision is necessary to carry into execution those insurance reforms. Can you create commerce in order to regulate it? That's not what's going on here, Justice Kennedy, and we're not seeking to defend the law on that basis. In this case, what is being regulated is the method of financing the purchase of health care. That itself is economic activity with substantial effects on interstate commerce. So any self-purchasing? You know, if I'm in any market at all, my failure to purchase something in that market subjects me to regulation? No, that's not our position at all, Justice Scalia. In the health care market, the health care market is characterized by the fact that, aside from the few groups that Congress chose to exempt from the minimum coverage requirement, those who for religious reasons don't participate, those who are incarcerated, Indian tribes, virtually everybody else is either in that market or will be in that market. And a distinguishing feature of that is that they cannot, people cannot generally control when they enter that market or what they need when they enter that market. The same, it seems to me, would be true, say, for the market in emergency services. Police, fire, ambulance, roadside assistance, whatever. You don't know when you're going to need it, you're not sure that you will, but the same is true for health care. You don't know if you're going to need a heart transplant or if you ever will. So there's a market there. To some extent, we all participate in it. So can the government require you to buy a cell phone? Because that would facilitate responding when you need emergency services. You can just dial 911 no matter where you are. No, Mr. Chief Justice, I think that's different. I don't think we think of that as a market. This is a market. This is market regulation. And in addition, you have a situation in this market not only where people enter involuntarily as to when they enter and won't be able to control what they need when they enter. It seems to me that's the same as in my hypothetical. You don't know when you're going to need police assistance. You can't predict the extent to emergency response that you'll need. But when you do, and the government provides it. I thought that was an important part of your argument, that when you need health care, the government will make sure you get it. Well, when you need police assistance or fire assistance or ambulance assistance, the government is going to make sure to the best extent it can that you get it. I think the fundamental difference, Mr. Chief Justice, is that that's not an issue of market regulation. This is an issue of market regulation, and that's how Congress looked at this problem. There is a market. Insurance is provided through a market system. Do you think there is a market for burial services? For burial services? Yes. Yes, Justice Alito. I suppose that you and I walked around downtown Washington at lunch hour and we found a couple of healthy young people and we stopped them and we said, you know what you're doing? You are financing your burial services right now because eventually you're going to die and somebody is going to have to pay for it, and if you don't have burial insurance or you haven't saved money for it, you're going to shift the cost to somebody else. Isn't that a very artificial way of talking about what somebody is doing? That's true. Why isn't it equally artificial to say that somebody who is doing absolutely nothing about health care is financing health care services? I think it's completely different, and the reason is that the burial example is not... The difference is here you are regulating the method by which you are paying for something else, health care, and the insurance requirement... I think the key thing here is my friends on the other side acknowledge that it is within the authority of Congress under Article I under the Commerce Power to impose guaranteed issue in community rating forms and to impose a minimum coverage provision. Their argument is just that it has to occur at the point of sale. I don't see the difference. You can get burial insurance, you can get health insurance. Most people are going to need health care, almost everybody. Everybody is going to be buried or cremated at some point. One big difference, Justice Alito, is you don't have the cost shifting to other market participants. Sure you do, because if you don't have money, then the state is going to pay for it or a family member. That's a difference, and it's a significant difference, that in this situation, one of the economic effects Congress is addressing is that the many billions of dollars of uncompensated costs are transferred directly to other market participants. It's transferred directly to other market participants because health care providers charge higher rates in order to cover the cost of uncompensated care, and insurance companies reflect those higher rates in higher premiums, which Congress found translates to $1,000 per family. Isn't that really a small part of what the mandate is doing? You can correct me if these figures are wrong, but it appears to me that the CBO has estimated that the average premium for a single insurance policy in the non-group market will be roughly $5,800 in 2016. Respondents, the economists who supported the respondents, estimate that a young, healthy individual targeted by the mandate on average consumes about $854 in health services each year. So the mandate is forcing these people to provide a huge subsidy to the insurance companies for other purposes that the Act wishes to serve. But if those figures are right, isn't it the case that what this mandate is really doing is not requiring the people who are subject to it to pay for the services that they are going to consume? It is requiring them to subsidize services that will be received by somebody else. No, I do think that's what the respondents argue. It's just not right. I think it really gets to a fundamental problem If you're going to have insurance, that's how insurance works. A, it is how insurance works, but B, the problem that they're identifying is not that problem. The guaranteed-issue and community rating reforms do not have the effect of forcing insurance companies to take on lots of additional people who they then can't afford to cover because they tend to be the sick. And that is, in fact, the exact opposite is what happens here. When you enact guaranteed-issue and community rating reforms and you do so in the absence of a minimum coverage provision, it's not that insurance companies take on more and more people and then need a subsidy to cover it. It's that fewer and fewer people end up with insurance because the rates are not regulated. Insurance companies, when they have to offer guaranteed-issue and community rating, they're entitled to make a profit. They charge rates sufficient to cover only the sick population. Could you help me with this? Assume for the moment you may disagree. Assume for the moment that this is unprecedented, this is a step beyond what our cases have allowed, the affirmative duty to act to go into commerce. If that is so, do you not have a heavy burden of justification? I understand that we must presume laws are constitutional. But even so, when you are changing the relation of the individual to the government in this, what we can stipulate is, I think, a unique way. Do you not have a heavy burden of justification to show authorization under the Constitution? So, two things about that, Justice Kennedy. First, we think this is regulation of people's participation in the health care market. And all this minimum coverage provision does is say that instead of requiring insurance at the point of sale, that Congress has the authority, under the commerce power and the necessary proper power, to ensure that people have insurance in advance of the point of sale because of the unique nature of this market, because this is a market in which, although most of the population is in the market most of the time, 83% visit a physician every year, 96% over a five-year period. So virtually everybody in society is in this market. And you've got to pay for the health care you get. The predominant way in which it's paid for is insurance. And the respondents agree that Congress could require that you have insurance in order to get health care or forbid health care from being provided. Why do you define the market that broadly, health care? It may well be that everybody needs health care sooner or later, but not everybody needs a heart transplant. Not everybody needs a liver transplant. That's correct, Justice Kennedy, but you never know whether you're going to be that person. Could you define the market? Everybody has to buy food sooner or later, so you define the market as food. Therefore, everybody's in the market. Therefore, you can make people buy broccoli. No, it's quite different. It's quite different. The food market, while it shares that trait that everybody's in it, it is not a market in which participation is often unpredictable and often involuntary. It is not a market in which you often don't know before you go in what you need, and it is not a market in which if you go in and seek to obtain a product or service, you will get it even if you don't get it. Is that a principle basis for distinguishing this from other situations? I mean, you could also say, well, the person subject to this has blue eyes. That would indeed distinguish it from other situations. Is it a principle basis? I mean, it's a basis that explains why the government is doing this, but is it a basis which shows that this is not going beyond what the system of enumerated powers allows the government to do? Yes, for two reasons. First, the test, as this Court has articulated it, is Congress regulating economic activity with a substantial effect on interstate commerce. The way in which this statute satisfies the test is on the basis of the factors that I have identified. Mr. Verrilli, I thought that your main point is that unlike food or any other market, when you make a choice not to buy insurance, even though you have every intent in the world to self-insure, to save for it, when disaster strikes, you may not have the money. And the tangible result of it is we were told there was one brief that Maryland hospital care bills 7% more because of these uncompensated costs, that families pay $1,000 more than they would if there were no uncompensated costs. I thought what was unique about this is it's not my choice whether I want to buy a product to keep me healthy, but the cost that I'm forcing on other people if I don't buy the product sooner rather than later. That is definitely a difference that distinguishes this market and justifies this as a regulation of economic activity. If that is your difference, I'm somewhat uncertain about your answers to, for example, Justice Kennedy asked, can you, under the Commerce Clause, Congress create commerce where previously none existed? Yeah, I thought the answer to that was since McCulloch versus Maryland, when the court said Congress could create the Bank of the United States, which did not previously exist, which job was to create commerce that did not previously exist? Since that time, the answer has been yes. I would have thought that your answer to can the government, in fact, require you to buy cell phones or buy burials, that if we propose comparable situations, if we have, for example, a uniform United States system of paying for every burial, such as Medicare burial, Medicaid burial, CHIP burial, ERISA burial, and emergency burial beside the side of the road, and Congress wanted to rationalize that system, wouldn't the answer be yes? Of course they could. And the same with the computers, or the same with the cell phones, if you're driving by the side of the highway and there is a Federal emergency service, just as you say you have to buy certain mufflers for your car that don't hurt the environment, you could say — I mean, you see, doesn't it depend on the situation? It does, Justice Breyer. And if Congress were to enact laws like that, we would be up here defending them. I would defend them on a rationale like that. But I do think that we are advancing a narrower rationale. Again, the question is whether or not there are any limits on the Commerce Clause. Can you identify for us some limits on the Commerce Clause? Yes. The rationale purely under the Commerce Clause that we're advocating here would not justify forced purchases of commodities for the purpose of stimulating demand. It would not justify purchases of insurance for the purposes — in situations in which insurance doesn't serve as the method of payment. But why not? If Congress says that interstate commerce is affected, isn't, according to your view, that the end of the analysis? No. We think that in a — when Congress — The difference between those situations and this situation is that in those situations, Your Honor, Congress would be moving to create commerce. Here, Congress is regulating existing commerce, economic activity that is already going on, people's participation in the health care market, and is regulating to deal with existing effects of existing commerce. That, it seems to me, is — and it's a passage in your reply brief that I didn't quite grasp. It's the same point. You say health insurance is not purchased for its own sake, like a car or broccoli. It is a means of financing health care consumption and covering universal risks. Well, a car or broccoli aren't purchased for their own sake either. They're purchased for the sake of transportation or, in broccoli, covering the need for food. I don't understand that. The difference, Mr. Chief Justice, is that health insurance is the means of payment for health care. Well, now, that's a significant — I'm sorry. And broccoli is not the means of payment for anything else. But the means of satisfying a basic human need. Insurance is the means of satisfying — But I do think that's the difference between existing commerce, activity in the market already occurring, the people in the health care market purchasing and attaining health care services, and the creation of commerce. And the principle that we're advocating here under the Commerce Clause does not take the step of justifying the creation of commerce. This is a regulation of commerce. Can we go back to — Justice Breyer asked a question and kind of interrupted your answer to my question. And tell me if I'm wrong about this. I thought a major, major point of your argument was that the people who don't participate in this market are making it much more expensive for the people who do. That is, they will get — a goodly number of them will get services that they can't afford at the point when they need them. And the result is that everybody else's premiums get raised. So you're not — it's not your free choice just to do something for yourself. What you do is going to affect others, affect them in a major way. That absolutely is a justification for Congress's action here. That is existing economic activity that Congress is regulating by means of — You could say that about buying a car. If people don't buy cars, the price that those who do buy cars pay will have to be higher. So you can say in order to bring the price down, you are hurting these other people by not buying a car. That is not what we're saying, Justice Scalia. That's not what you're saying. I thought it was. I thought you were saying other people are going to have to pay more for insurance because you're not buying it. No, it's because you're going in the health care market, you're going into the market without the ability to pay for what you get, getting the health care service anyway as a result of the social norms that allow — to which we've obligated ourselves. Well, don't obligate yourself to that. I can't imagine that the Commerce Clause would forbid Congress from taking into account this deeply embedded social norm. You can do it. But does that expand your ability to issue mandates to the people? This is not a purchase mandate. This is a law that regulates the method of paying for a service that the class of people to whom it applies are consuming or inevitably will consume. General, I see or have seen three strands of arguments in your briefs, and one of them is echoed today. The first strand that I've seen is that Congress can pass any necessary laws to affect those powers within its rights, i.e., because it made a decision to affect mandatory issuance of insurance, that it could also obligate the mandatory purchase of it. The second strand I see is self-insurance affects the market, and so the government can regulate those who self-insure. And the third argument, and I see all of them as different, is that what the government is doing, and I think it's the argument you're making today, that what the government is saying is if you pay for health — if you use health services, you have to pay with insurance, because only insurance will guarantee that whatever need for health care that you have will be covered, because virtually no one, perhaps with the exception of one percent of the population, can afford the massive cost if the unexpected happens. This third argument seems to be saying what we're regulating is health care, and when you go for health services, you have to pay for insurance. And since insurance won't issue at the moment that you consume the product, we can reasonably, necessarily, tell you to buy it ahead of time, because you can't buy it at the moment that you need it. Is that — which of these three is your argument? Are all of them your argument? I'm just not sure what the — So, let me try to state it this way. The Congress enacted reforms of the insurance market, the Guaranteed Issuing Community Rating Reforms. It did so to deal with a very serious problem that results in 40 million people not being able to get insurance and therefore not access to the health care market. Everybody agrees in this case that those are within Congress's Article I powers. The minimum coverage provision is necessary to carry those provisions into execution, because without them, without those provisions, without minimum coverage, Guaranteed Issuing Community Rating will, as the experience in the states showed, make matters worse, not better. There will be fewer people covered. It will cost more. So, on that ground, you're answering affirmatively to my colleagues that have asked you the question, can the government force you into commerce? And there's no limit to that. No, because that's the first part of our argument. The second part of our argument is that the means here that Congress has chosen, the minimum coverage provision, is a means that regulates economic activity, namely your transaction in the health care market, with substantial effects on interstate commerce. And it is the conjunction of those two that we think provides the particularly secure foundation for this statute under the commerce power. General, you've talked a couple of times about other alternatives that Congress might have had, other alternatives that the respondents suggest to deal with this problem, in particular the alternative of mandating insurance at the point at which somebody goes to a hospital or an emergency room and asks for care. Did Congress consider those alternatives? Why did it reject them? How should we think about the question of alternative ways of dealing with these problems? I do think, Justice Kagan, that the point of difference between my friends on the other side and the United States is about one of timing. They've agreed that Congress has Article I authority to impose an insurance requirement or other penalty at the point of sale, and they've agreed that Congress has the authority to do that, to achieve the same objectives that the minimum coverage provision of the Affordable Care Act is designed to achieve. This is a situation in which we are talking about means. Congress gets substantial deference in the choice of means, and if one thinks about the difference between the means they say Congress should have chosen and the means Congress did choose, I think you can see why it was eminently more sensible for Congress to choose the means that it chose. I'm not sure which way it cuts if the Congress has alternate means. Let's assume that it could use the tax power to raise revenue and to just have a national health service, a single payer. How does that factor into our analysis? In one sense, it can be argued this is what the government's doing. It ought to be honest about the power that it's using and use the correct power. On the other hand, it means that since the court can do it any way, if Congress can do it any way, we give a certain amount of latitude. I'm not sure which way the argument goes. Let me try to answer that question, Justice Kennedy, and get back to the question you asked me earlier. I do think one striking feature of the argument here that this is a novel exercise of power is that what Congress chose to do was to rely on market mechanisms and efficiency and a method that has more choice than would the traditional Medicare or Medicaid type model. And so it seems a little ironic to suggest that that counts against it. But beyond that, in the sense that it's novel, this provision is novel in the same way or unprecedented in the same way that the Sherman Act was unprecedented when the court upheld it in the Northern Securities case or the Packers and Stockyards Act was unprecedented when the court upheld it or the National Labor Relations Act was unprecedented when the court upheld it in Jones and Lachlan or the dairy price supports in Wrightwood Dairy. No, it's not. They all involved commerce. There was no doubt that what was being regulated was commerce. And here you're regulating somebody who isn't commerce. By the way, I don't agree with you that the relevant market here is health care. You're not regulating health care. You're regulating insurance. It's the insurance market that you're addressing, and you're saying that some people who are not in it must be in it. And that's different from regulating in any manner commerce that already exists out there. Well, to the extent that we're looking at the comprehensive scheme, Justice Scalia, it is regulating commerce that already exists out there. And the means in which that regulation is made effective here, the minimum coverage provision, is a regulation of the way in which people participate, the method of their payment in the health care market. That is what it is. And I do think, Justice Kennedy, getting back to the question you asked before, what matters here is whether Congress is choosing a tool that's reasonably adapted to the problem that Congress is confronting. And that may mean that the tool is different from a tool that Congress has chosen to use in the past. That's not something that counts against the provision in a commerce clause. It's both necessary and proper. What you just said addresses what's necessary. Yes, it has to be reasonably adapted. Necessary does not mean essential. Just reasonably adapted. But in addition to being necessary, it has to be proper. And we've held in two cases that something that is reasonably adapted was not proper because it violated the sovereignty of the states, which was implicit in the constitutional structure. The argument here is that this also is maybe necessary, but it's not proper, because it violates an equally evident principle in the Constitution, which is that the federal government is not supposed to be a government that has all powers. That it's supposed to be a government of limited powers. And that's what all this questioning has been about. What is left? If the government can do this, what else can it not do? This does not violate the norm of proper, as this Court articulated it in Prince or in New York, because it does not interfere with the states as sovereigns. This is a regulation that — this is a regulation that — But, no, that was my point. That is not the only constitutional principle that exists. An equally evident constitutional principle is the principle that the federal government is a government of enumerated powers. And that the vast majority of powers remain in the states and do not belong to the federal government. Do you acknowledge that that's the principle? Of course we do, Your Honor. Okay. And that's what we're talking about. And the way in which this Court in its cases has policed the boundary of what's in the national sphere and what's in the local sphere is to ask whether Congress is regulating economic activity with a substantial effect on interstate commerce. And here, I think it's really impossible in view of our history to say that Congress is invading the state sphere. This is a market in which 50 percent of the people in this country get their health care through their employer. There is a massive federal tax subsidy of $250 billion a year that makes that much more affordable. ERISA and HIPAA regulate that to ensure that the kinds of bans on preexisting condition discrimination and pricing practices that occur in the individual market don't occur. I don't understand your point. Whatever the states have chosen not to do, the federal government can do. No, not at all. I mean, the Tenth Amendment says the powers not given to the federal government are reserved not just to the states, but to the states and the people. And the argument here is that the people were left to decide whether they want to buy insurance or not. But, Your Honor, this is what the Court has said, and I think it would be a very substantial departure from what the Court has said, is that when Congress is regulating economic activity with a substantial effect on interstate commerce, that will be upheld. And that is what is going on here, and to embark on it, I would submit with all due respect to embark on the kind of analysis that my friends on the other side suggest the Court ought to embark on, is to import Lochner-style substantive due process. The key in Lochner is that we were talking about regulation of the states, right? And the states are not limited to enumerated powers. The federal government is. And it seems to me it's an entirely different question when you ask yourself whether or not there are going to be limits on the federal power as opposed to limits on the states, which was the issue in Lochner. I agree, except, Mr. Chief Justice, that what the Court has said, as I read the Court's cases, is that the way in which you ensure that the federal government stays in its sphere and the sphere reserved to the states is protected is by policing the boundary. Is the national government regulating economic activity with substantial effect on interstate commerce? But the reason this is concerning is because it requires the individual to do an affirmative act. In the law of torts, our tradition, our law has been that you don't have the duty to rescue someone if that person is in danger. The blind man is walking in front of the car and you do not have a duty to stop him, absent some relation between you. And there's some severe moral criticisms of that rule, but that's generally the rule. And here the government is saying that the federal government has a duty to tell the individual citizen that it must act, and that is different from what we have in previous cases. That changes the relationship of the federal government to the individual in a very fundamental way. I don't think so, Justice Kennedy, because it is predicated on the participation of these individuals in the market for health care services. Now, it happens to be that this is a market in which, aside from the groups that the statute excludes, virtually everybody participates. But it is a regulation of their participation in that market. But it's critical how you define the market. If I understand the law, the policies that you're requiring people to purchase involve must contain provision for maternity and newborn care, pediatric services, and substance use treatment. It seems to me that you cannot say that everybody is going to need substance use treatment, substance use treatment or pediatric services, and yet that is part of what you require them to purchase. Well, it's part of what the statute requires the insurers to offer, and I think the reason is because it's trying to define minimum essential coverage because But your theory is that there is a market in which everyone participates because everybody might need a certain range of health care services. And yet you're requiring people who are never going to need pediatric or maternity services to participate in that market. With respect to what insurance has to cover, Your Honor, I think Congress is entitled to latitude in making the judgments of what the appropriate scope of coverage is, and the problem here in this market is that you may think you're perfectly healthy and you may think that you're being forced to subsidize somebody else, but this is not a market in which you can say that there is an immutable class of healthy people who are being forced to subsidize the unhealthy. This is a market in which you may be healthy one day and you may be a very unhealthy participant in that market the next day, and that is a fundamental difference. I think you're posing the question I was posing, which is that doesn't apply to a lot of what you're requiring people to purchase, pediatric services, maternity services. You cannot say that everybody is going to participate in the substance use treatment market, and yet you require people to purchase insurance coverage for that. Congress is enacting economic regulation here. It has latitude to define the attributes of essential coverage. That doesn't seem to me implicate the question whether Congress is engaging in economic regulation and solving an economic problem. Are you denying this? If you took the group of people who are subject to the mandate and you calculated the amount of health care services this whole group would consume and figured out the cost of an insurance policy to cover the services that group would consume, the cost of that policy would be much, much less than the kind of policy that these people are now going to be required to purchase under the Affordable Care Act. Well, while they're young and healthy, that would be true, but they're not going to be young and healthy forever. They're going to be on the other side of that actuarial equation at some point, and, of course, you don't know which among that group is the person that's going to be hit by the bus or get the definitive diagnosis. So the point is, no, you take into account that some people in that group are going to be hit by a bus. Some people in that group are going to unexpectedly contract or be diagnosed with a disease that is very expensive to treat. But if you take their costs and you calculate that, that's a lot less than the amount that they're going to be required to pay. So you can't just justify this on the basis of they're trying to shift their costs off to other people, can you? Well, no, the people in that class get benefits, too, Justice Alito. They get the guaranteed issue benefit that they would not otherwise have, which is an enormously valuable benefit. And in terms of the subsidy rationale, I think it would be unusual to say that it's an illegitimate exercise of the commerce power for some people to subsidize others. Telephone rates in this country for a century were set via the exercise of the commerce power in a way in which some people paid rates that were much higher than their costs in order to subsidize. Only if you make phone calls. Well, right, but to live in the modern world, everybody needs a telephone. And the same thing with respect to, you know, the dairy price supports that the court upheld in Wrightwood Dairy and Rock Royal. You can look at those as disadvantageous contracts, as forced transfers, that, you know, I suppose it's theoretically true that you could raise your kids without milk, but the reality is you've got to go to the store and buy milk, and the commerce power, as a result of the exercise of the commerce power, you're subsidizing somebody else. And this is especially true, isn't it, General Varelli? Because in this context, the subsidizers eventually become the subsidized. Well, that was the point I was trying to make, Justice Kagan, that you're young and healthy one day, but you don't stay that way, and the system works over time. And so I just don't think it's a fair characterization of it. And it does get back to a problem I think is important to understand. They're not stupid. They're going to buy insurance later. They're young and need the money now. When they think they have a substantial risk of incurring high medical bills, they'll buy insurance like the rest of us. I don't know why you think that they're never going to buy it. That's the problem, Justice Scalia, and that's exactly the experience that the states had that made the imposition of guaranteed issuing community rating not only be ineffectual but be highly counterproductive. Rates, for example, in New Jersey doubled or tripled, went from 180,000 people covered in this market down to 80,000 people covered in this market. In Kentucky, virtually every insurer left the market, and the reason for that is because when people have that guarantee that they can get insurance, they're going to make that calculation that they won't get it until they're sick and they need it. And so the pool of people in the insurance market gets smaller and smaller. The rates you have to charge to cover them get higher and higher. Insurance covers fewer and fewer people until the system ends. This is not a situation in which you're conscripting, you're forcing insurance companies to cover very large numbers of people. You can solve that problem by simply not requiring the insurance company to sell it to somebody who has a condition that is going to require medical treatment, or at least not require them to sell it to him at a rate that he sells it to healthy people. But you don't want to do that. But that seems to me to say, Justice Scalia, that Congress, that's the problem here. It's a self-created problem. Congress cannot solve the problem through standard economic regulation, and I do not think that can be the premise of our understanding. Whatever problems Congress's economic regulation produces, whatever they are, I think Congress can do something to counteract them. Requiring somebody to enter the insurance market. It's not a problem of Congress's creation. The problem is that you have 40 million people who cannot get affordable insurance through the means that the rest of us get affordable insurance. Congress, after a long study and careful deliberation, and viewing the experiences of the states and the way they tried to handle this problem, adopted a package of reforms. Guaranteed issue on community rating and subsidies and minimum coverage provision are a package of reforms that solve that problem. I think it's highly artificial to view this as a problem of Congress's own creation. Is your argument limited to insurance or means of paying for health care? Yes, it's limited to insurance. Well, now, why is that? Once you establish that you have a market for health care, I would suppose Congress's power under the Commerce Clause meant they had a broad scope in terms of how they regulate that market. And it would be going back to Lochner if we were put in a position of saying, no, you can use your commerce power to regulate insurance, but you can't use your commerce power to regulate this market in other ways. I think that would be a very significant intrusion by the Court into Congress's power. So I don't see how we can accept your — it's good for you in this case to say, oh, it's just insurance. But once we say that there is a market and Congress can require people to participate in it, as some would say, or as you would say, that people are already participating in it, it seems to me that we can't say there are limitations on what Congress can do under its commerce power, just like in any other area, all — given significant deference that we accord to Congress in this area, all bets are off, and you can regulate that market in any rational way. But this is insurance as a method of payment for health care services. Exactly. You're worried — that's the area that Congress has chosen to regulate. There's this health care market, everybody's in it, so we can regulate it, and we're going to look at a particular serious problem, which is how people pay for it. But next year they can decide, everybody's in this market, we're going to look at a different problem now, and this is how we're going to regulate it. And we can compel people to do things, purchase insurance in this case, something else in the next case, because we've accepted the argument that this is a market in which everybody participates. Mr. Chief Justice, let me answer that, and then if I may, I'd like to move to the tax power argument. Can I tell you what the something else is, so while you're answering it? The something else is everybody has to exercise, because there's no doubt that lack of exercise causes illness, and that causes health care costs to go up. So the federal government says everybody has to join an exercise club. That's the something else. No, the position we're taking here would not justify that rule, Justice Scalia, because health club membership is not a means of payment for consumption of anything in a market. That's exactly right, but it doesn't seem responsive to my concern that there's no reason, once we say this is within Congress's Congress power, there's no reason other than our own arbitrary judgment to say all they can regulate is the method of payment. They can regulate other things that affect this now conceded interstate market in health care, in which everybody participates. But I think it's common ground between us and the respondents that this is an interstate market in which everybody participates, and they agree that Congress could impose the insurance requirement at the point of sale, and this is just a question of timing, and whether the necessary and proper authority gives Congress, because of the particular features of this market, the ability to impose the insurance, the need for insurance, the maintenance of insurance before you show up to get health care rather than at the moment you get up to show up to get health care. Unless I'm missing something, I think you're just repeating the idea that this is the regulation of the method of payment, and I understand that argument. It may be a good one. But what I'm concerned about is once we accept the principle that everybody is in this market, I don't see why Congress's power is limited to regulating the method of payment and doesn't include as it does in any other area. What other area have we said Congress can regulate this market, but only with respect to prices, but only with respect to means of travel? No, once you're in the interstate commerce and can regulate it, pretty much all bets are off. But we agree Congress can regulate this market. ERISA regulates this market. HIPAA regulates this market. The market is regulated at the federal level in very significant ways already, so I don't think that's the question, Mr. Chief Justice. The question is, is there a limit to the authority that we're advocating here in the commerce power? And the answer is yes, because we are not advocating for a power that would allow Congress to comply. Could you just say, before you move on, could you express your limiting principle as succinctly as you possibly can? Congress can force people to purchase a product where the failure to purchase the product has a substantial effect on interstate commerce if what? If this is part of a larger regulatory scheme? Is that it? Is there anything more? We've got two, and they're different. Let me state them. First, with respect to the comprehensive scheme, when Congress is regulating, is enacting a comprehensive scheme that it has the authority to enact, that the Necessary and Proper Clause gives it the authority to include regulation, including a regulation of this kind, if it is necessary to counteract risks attributable to the scheme itself that people engage in economic activity that would undercut the scheme, it's very much like Wickard in that respect, very much like Raich in that respect. With respect to considering the Commerce Clause alone and not embedded in the comprehensive scheme, our position is that Congress can regulate the method of payment by imposing an insurance requirement in advance of the time in which the service is consumed when the class to which that requirement applies either is or virtually will certainly be in that market, when the timing of one's entry into that market and what you will need when you enter that market is uncertain, and when you will get the care in that market, whether you can afford to pay for it or not, and shift costs to other market participants. So those are our views. Those are the principles we're advocating for. And it's, in fact, the conjunction of the two of them here that makes this, we think, a strong case under the Commerce Clause. JUSTICE SOTOMAYOR. General, could you turn to the Tax Clause? CHIEF JUSTICE ROBERTS. Yes, thank you. JUSTICE SOTOMAYOR. I have looked for a case that involved the issue of whether something denominated by Congress as a penalty was nevertheless treated as a tax, except in those situations where the Code itself or the statute itself said treat the penalty as a tax. Do you know of any case where we've done that? CHIEF JUSTICE ROBERTS. Well, I think I would point the Court to the license tax case, where it was, it was denominated a fee and not a tax, and the Court upheld it as an exercise of the taxing power, in a situation in which the structure of the law was very much like the structure of this law, in that there was a separate stand-alone provision that set the predicate, and then a separate provision imposing the fee. And, you know, license fees, fees for a hunting license, everybody knows those are taxes. I mean, I don't think there's as much of a difference between a fee and a tax as there is between a penalty and a tax. CHIEF JUSTICE ROBERTS. And I think in terms of the tax power, I think it's useful to separate this into two questions. One is a question of characterization. Can this be characterized as a tax? And the second, is it a constitutional exercise of the power? With respect to the question of characterization, this is in the Internal Revenue Code. It is administered by the IRS. It is paid on your Form 1040 on April 15th. JUSTICE GINSBURG. But yesterday you told me you listed a number of penalties that are enforced through the tax code that are not taxes, and they're not penalties related to taxes. CHIEF JUSTICE ROBERTS. They may still be exercises of the taxing power, Justice Ginsburg, as this is. And I think there isn't a case in which the Court has, to my mind, suggested that anything that bears this many addition of a tax can't be considered as an exercise of the taxing power. In fact, it seems to me the license tax cases point you in the opposite direction. And beyond that, it seems to me the right way to think about this question is whether it is capable of being understood as an exercise of the tax power. JUSTICE SCALIA. The President said it wasn't a tax, didn't he? CHIEF JUSTICE ROBERTS. Well, Justice Scalia, there's two things about that. First is it seems to me what matters is what power Congress was exercising. And I think it's clear that they were exercising the tax power as well as the tax power. JUSTICE SCALIA. You're making two arguments. Number one, it's a tax. And number two, even if it isn't a tax, it's within the taxing power. I'm just addressing the first. CHIEF JUSTICE ROBERTS. Look, the President said it wasn't a tax. JUSTICE SCALIA. Is it a tax or not a tax? The President didn't think it was. CHIEF JUSTICE ROBERTS. The President said it wasn't a tax increase because it ought to be understood as an incentive to get people to have insurance. I don't think it's fair to infer from that anything about whether this is an exercise of the tax power or not. JUSTICE GINSBURG. The tax is to raise revenue. A tax is a revenue-raising device. And the purpose of this exemption is to get people into the health care risk pool before they need medical care. And so it will be successful if it doesn't raise any revenue. If it gets people to buy the insurance, that's what this penalty is. This penalty is designed to affect conduct. The conduct is buy health protection, buy health insurance before you have a need for medical care. That's what the penalty is designed to do, not to raise revenue. That is true, Justice Ginsburg. That is also true of the marijuana tax that was upheld in Sanchez. That's commonly true of penalties under the Code. They do, if they raise revenue, they are exercises of the taxing power. But their purpose is not to raise revenue. Their purpose is to discourage behavior. I mean, the mortgage deduction works that way. When the mortgage deduction is clearly an exercise of the taxing power, when it's successful, it raises less revenue for the federal government. It's still an exercise of the taxing power. I suppose, though, General, one question is whether the determined efforts of Congress not to refer to this as a tax make a difference. I mean, you're suggesting we should just look to the practical operation, we shouldn't look at labels. And that seems right, except that here we have a case in which Congress determinately said this is not a tax. And the question is why should that be irrelevant? I don't think that that's a fair characterization of the actions of Congress here, Justice Kagan. On December 23rd, a point of constitutional order was called, too, in fact, with respect to this law. The floor sponsor, Senator Baucus, defended it as an exercise of the taxing power in his response to the point of order. The Senate voted 60 to 39 on that proposition. The legislative history is replete with members of Congress explaining that this law is constitutional as an exercise of the taxing power. It was attacked as a tax by its opponents. So I don't think this is a situation where you can say that Congress was avoiding any mention of the tax power. It would be one thing if Congress explicitly disavowed an exercise of the tax power, but But this Court has got an obligation to construe it as an exercise of the tax power if it can be upheld on that basis. Well, why didn't Congress call it a tax then? Well, you're telling me they thought of it as a tax, they defended it on the tax power. Why didn't they say it was a tax? They might have thought, Your Honor, that calling it a penalty as they did would make it more effective in accomplishing its objectives. But it is in the Internal Revenue Code. It is collected by the IRS on April 15th. I don't think it's a situation in which you can say But that's the reason. They thought it might be more effective if they called it a penalty. Well, there's nothing that I know that illuminates that. General, the problem goes back to the limiting principle. Is this simply anything that raises revenue Congress can do? No. There are certain limiting principles under the taxing power. And I think, of course, the Constitution imposes some. It's got to be uniform. It can't be tax on exports. If it's a direct tax, it's got to be apportioned. Beyond that, the limiting principle that the Court has identified from Drexel Furniture to Kurth Ranch is that it can't be punishment, punitive in the guise of a tax. And there are three factors the Court has identified to look at that. The first is the sanction and how disproportionate it is to the conduct. The second is whether there's a scienter. And the third is whether there's an administrative apparatus out there to enforce the tax. Now, in Bailey against Drexel Furniture, for example, the tax was 10 percent of the company's profits, even if they had only one child laborer for one day. There was a scienter requirement, and it was enforced by the Department of Labor. It wasn't just collected by the Internal Revenue Service. Here, you don't have any of those things. The penalty is calculated to be no more than, at most, the equivalent of what one would have paid for insurance that you've foregone. There's no scienter requirement. There's no enforcement apparatus out there. So it's certainly a mandate that was viewed as a tax if it does impose a requirement on people who are not subject to the penalty or the tax. I think it could, for the reasons I discussed yesterday. I don't think it can or should be read that way. But if there's any doubt about that, Your Honor, if it is the view of the Court that it can't be, then I think that the right way to handle this case is by analogy to New York against the United States, in which the Court read the shall provision, shall handle low-level radioactive waste, as setting the predicate, and then the other provisions were merely incentives to get the predicate met. So you're saying that all the discussion we had earlier about how this is one big uniform scheme and the Commerce Clause, blah, blah, blah, blah, but it really doesn't matter. This is a tax, and the federal government could simply have said, without all of the rest of this legislation, could simply have said, everybody who doesn't buy health insurance at a certain age will be taxed so much money. Right? It used its powers together to solve the problem of the market not providing affordable health insurance. But you didn't need that. You didn't need that. It's a tax. It's only raising money is enough. It is justifiable under its tax power. If I may reserve the balance of my time. That's good. Thank you, General. We'll take a pause for a minute or so, Mr. Clement. Mr. Clement, Mr. Chief Justice, and may it please the Court, the mandate represents an unprecedented effort by Congress to compel individuals to enter commerce in order to better regulate commerce. The Commerce Clause gives Congress the power to regulate existing commerce. It does not give Congress the far greater power to compel people to enter commerce to create commerce essentially in the first place. Now, Congress, when it passed the statute, did make findings about why it thought it could regulate the commerce here. And it justified the mandate as a regulation of the economic decision to forego the purchase of health insurance. That is a theory without any limiting principle. Do you accept the General's position that you have conceded that Congress could say if you're going to consume health services, you have to pay by way of insurance? That's right, Justice Sotomayor. We say, consistent with 220 years of this Court's jurisprudence, that if you regulate the point of sale, you regulate commerce, that's within Congress's commerce power. All right. So what do you do with the impossibility of buying insurance at the point of consumption? Virtually, you force insurance companies to sell it to you? Well, Justice, I think there's two points to make on that. One is a lot of the discussion this morning so far has proceeded on the assumption that the only thing that's at issue here is emergency room visits, and the only thing that's being imposed is catastrophic care coverage. But as the Chief Justice indicated earlier, a lot of the insurance that's being covered is for ordinary preventive care, ordinary office visits, and those are the kind of things that one can predict. So there's a big part of the market that's regulated here that wouldn't pose the problem that you're suggesting. But even as to emergency room visits, it certainly would be possible to regulate at that point. You could simply say there is some sort of mandate on the insurance companies. You have to provide people that come in. This will be a high-risk pool, and maybe you'll have to share it amongst yourself or something. But people simply have to sign up at that point, and that would be regulating at the point of sale. Well, Mr. Gorsuch, now it seems as though you're just talking about a matter of timing, that Congress can regulate the transaction. And the question is, when does it make best sense to regulate that transaction? And Congress surely has it within its authority to decide, rather than at the point of sale, given an insurance-based mechanism, it makes sense to regulate it earlier. It's just a matter of timing. Well, Justice Kagan, we don't think it's a matter of timing alone, and we think it has very significant substantive effects. Because if Congress tried to regulate at the point of sale, the one group that it wouldn't capture at all are the people who don't want to purchase health insurance and also have no plans of using health care services in the near term. And Congress very much wanted to capture those people. I mean, those people are essentially the golden geese that pay for the entire lowering of the premium. If the government's argument is this, and maybe I won't state it accurately, it is true that the non-insured young adult is in fact an actuarial reality insofar as our allocation of health services, insofar as the way health insurance companies figure risk, that person who's sitting at home in his or her living room doing nothing is an actuarial reality that can and must be measured for health service purposes. Is that their argument? Well, I don't know, Justice Kennedy, but if it is, I think there's at least two problems with it. One is, as Justice Alito's question suggested earlier, I mean, somebody who's not in the insurance market is sort of irrelevant as an actuarial risk. I mean, we could look at the people not in the insurance market, and what we'd find is that they're relatively young, relatively healthy, and they would have a certain pool of actuarial risks that would actually lead to lower premiums. The people that would be captured by guaranteed rating and community issue, guaranteed issue and community rating, would presumably have a higher risk profile, and there would be higher premiums. And one of the things, one of the things Congress sought to accomplish here was to force individuals into the insurance market to subsidize those that are already in it to lower the rates. And that's just not my speculation. That's finding I at 43A of the government's brief that has the statute, and that's one of the clear findings. Mr. Chairman, doesn't that work the way Social Security does? Let me put it this way. Congress in the 30s saw a real problem of people needing to have old age and survivor's insurance. And yes, they did it through a tax, but they said everybody's got to be in it because if we don't have the healthy in it, there's not going to be the money to pay for the ones who become old or disabled or widowed. So they required everyone to contribute. It was a big fuss about that in the beginning because a lot of people said maybe some people still do today. I could do much better if the government left me alone. I'd go into the private market, I'd buy an annuity, I'd make a great investment, and they're forcing me to pay for this Social Security that I don't want. But that's constitutional. So if Congress could see this as a problem when we need to have a group that will subsidize the ones who are going to get the benefits, it seems to me you're saying the only way that could be done is if the government does it itself. It can't involve the private market. It can't involve the private insurers. If it wants to do this, Social Security is its model. Government has to be government takeover. We can't have the insurance industry in it. Is that the position? No, I don't think it is, Justice Ginsburg. I think there are other options that are available. The most straightforward one would be to figure out what amount of subsidy to the insurance industry is necessary to pay for guaranteed issue and community rating. And once we calculate the amount of that subsidy, we could have a tax that's spread generally through everybody to raise the revenue to pay for that subsidy. That's the way we pay for most subsidies. Could we have an exemption? Could the government say everybody pays a share of health care responsibility payment to offset all the money that we're forced to spend on health care, we the government. But anybody who has an insurance policy is exempt from that tax. Could the government do that? The government might be able to do that. I think it might raise some issues about whether or not that would be a valid exercise of the taxing power. Under what theory wouldn't it be? Well, I do think that... We get tax credits for having solar-powered homes. We get tax credits for using fuel-efficient cars. Why couldn't we get a tax credit for having health insurance and saving the government from caring for us? Well, I think it would depend a little bit on how it was formulated, but my concern would be that it would just be a disguised, impermissible direct tax. And I do think... I mean, I don't want to suggest we get to the taxing power too soon, but I do think it's worth realizing that the taxing power is limited in the ability to impose direct taxes. And the one thing I think the framers would have clearly identified as a direct tax is a tax on not having something. I mean, the framing generation was divided over whether a tax on carriages was a direct tax or not. Hamilton thought that was an indirect tax. Madison thought it was a direct tax. I have little doubt that both of them would agree that a tax on not having a carriage would have clearly been a direct tax. I also think they would have thought it clearly wasn't a valid regulation of the market in carriages. And, you know, I mean, if you look at Hilton against the United States, that's this Court's first direct tax. Let me ask... Can I go back for a step? Because I don't want to get into a discussion of whether this is a good bill or not. Some people think it's going to save a lot of money. Some people think it won't. So I'm focusing just on the Commerce Clause, not on the Due Process Clause, the Commerce Clause. And I look back into history. And I think if we look back into history, we see sometimes Congress can create commerce out of nothing. That's the National Bank, which was created out of nothing to create other commerce out of nothing. I look back into history, and I see it seems pretty clear that if there are substantial effects on interstate commerce, Congress can act. And I look at the person who's growing marijuana in her house, or I look at the farmer who's growing wheat for home consumption. This seems to have more substantial effects. Is this commerce? Well, it seems to me more commerce than marijuana. I mean, is it in fact a regulation? Well, why not? If creating the bank is, why isn't this? And then you say, ah, but one thing here out of all those things is different. And that is you're making somebody do something. I say, hey, can't Congress make people drive faster than 45, 40 miles an hour on a road? Didn't they make that man in growing his own wheat go out into the market and buy other wheat for his cows? Didn't they make Mrs. If she married somebody who had marijuana in her basement, wouldn't she have to go and get rid of it? Affirmative action? I mean, where does this distinction come from? It sounds like sometimes you can, and sometimes you can't. So what is argued here is there is a large group of, what about a person that we discovered that there are, a disease is sweeping the United States, and 40 million people are susceptible of whom 10 million will die. Can't the federal government say all 40 million get inoculation? So here we have a group of 40 million, and 57% of those people visit emergency care or other care which we're paying for. And 22% of those pay more than $100,000 for that. And Congress says they're in the midst of this big thing. We just want to rationalize the system they're already in. So there, you got the whole argument. And I would like you to tell me. Answer those questions in inverse order. No, it's one question. And it's looking back at that history, the thing I can see that you say to some people, go buy, why does that make a difference in terms of the Commerce Clause? Well, Justice Breyer, let me start at the beginning of your question with McCulloch. McCulloch was not a commerce power case. It was both? No, the bank was not justified, and the corporation was not justified as an exercise of commerce power. So that is not a case that says that it's okay to conjure up the bank as an exercise of the commerce power. And what, of course, the Court didn't say, and I think the Court would have had a very different reaction to, is, you know, we're not just going to have the bank because that would be necessary and proper. We're going to force the citizenry to put all their money in the bank, because if we do that, then we know the Bank of the United States will be secure. I think the framers would have identified the difference between those two scenarios, and I don't think that the great Chief Justice would have said that forcing people to put their deposits in the Bank of the United States was necessary and proper. Now, if you look through all the cases you mentioned, I do not think you will find a case like this, and I think it's telling that you won't. I mean, the regulation of the wheat market in Wickard against Filburn, all this effort to address the supply side and what producers could do, what Congress was trying to do was support the price of wheat. It would have been much more efficient to just make everybody in America buy 10 loaves of bread. That would have had a much more direct effect on the price of wheat in the prevailing market. But we didn't do that. We didn't say, when we had problems in the automobile industry, that we're not just going to give you incentives, not just cash for clunkers, we're going to actually have everybody over $100,000 have to buy a new car. Well, Mr. Clement, the key to the government's argument to the contrary is that everybody is in this market. It's all right to regulate Wickard against Filburn because that's a particular market in which the farmer had been participating. Everybody is in this market. So that makes it very different than the market for cars or the other hypotheticals that you came up with. And all they're regulating is how you pay for it. Well, with respect, Mr. Chief Justice, I suppose the first thing you have to say is what market are we talking about? Because the government, this statute undeniably operates in the health care insurance market. And the government can't say that everybody's in that market. The whole problem is that everybody's not in that market, and they want to make everybody get into that market. Well, doesn't that seem a little bit, Mr. Clement, cutting the baloney thin? I mean, health insurance exists only for the purpose of financing health care. The two are inextricably interlinked. We don't get insurance so that we can stare at our insurance certificate. We get it so that we can go and access health care. Well, Justice Kagan, I'm not sure that's right. I think what health insurance does and what all insurance does is it allows you to diversify risk. And so it's not just a matter of I'm paying now instead of paying later. That's credit. Insurance is different than credit. Insurance guarantees you an upfront locked-in payment, and you won't have to pay any more than that, even if you incur much greater expenses. And every other market that I know of for insurance, we let people basically make the decision whether they're relatively risk-averse, whether they're relatively non-risk-averse, and they can make the judgment. But we don't in car insurance, meaning we tell people, buy car, not we, the states do, although you're going to — I'll ask you the question. Do you think that if some states decided not to impose an insurance requirement that the and require every individual to buy car insurance? Well, Justice Sotomayor, let me say this, which is to say you're right in the first point to say that it's the states that do it, which makes it different right there. But it's also — Well, that goes back to the substantive due process question. Is this a Lochner error argument that only the states can do this, even though it affects commerce? Cars indisputably affect commerce. So are you arguing that because the states have done it all along, the federal government is no longer permitted to legislate in this area? No, I think you might make a different argument about cars than you would make about health insurance, unless you tried to say — Health insurance, I mean, I've never gotten into an accident, thankfully, and I hope never. The vast majority of people have never gotten into an accident where they've injured others, yet we pay for it dutifully every year on the possibility that at some point we might get into that accident. But, Justice Sotomayor, what I think is different is there's lots of people in Manhattan, for example, that don't have car insurance because they don't have cars. And so they have the option of withdrawing from that market. It's not a directive position from the government. So even the car market is different from this market, where there's no way to get outside of the regulatory web. And that's, I think, one of the real problems with this, because, I mean, we take it as a given — But the given is that virtually everyone, absent some intervention from above, meaning that someone's life will be cut short in a fatal way, virtually everyone will use health care. At some point, that's right. But all sorts of people will not, say, use health care in the next year, which is the relevant period for the insurance. Do you think you can, better than the actuaries or better than the members of Congress who worked on it, look at the 40 million people who are not insured and say which ones next year will or will not use, say, emergency care? Can you do that any better than if we knew that 40 million people were suffering, about to suffer, a contagious disease, and only 10 million would get sick? Of course not. We don't know which? Of course not, Justice Breyer. But the point is that once Congress decides it's going to regulate extant commerce, it is going to get all sorts of latitude to make the right judgments about actuarial predictions, which actuarial to rely on, which one not to rely on. The question that's a proper question for this Court, though, is whether or not, for the first time ever in our history, Congress also has the power to compel people into commerce, because it turns out that would be a very efficient thing for purposes of Congress's optimal regulation of that market. But, Mr. Clement, this goes back to the Chief Justice's question, but, of course, the theory behind not just the government's case, but the theory behind this law is that people are in this market right now, and they're in this market because people do get sick, and because when people get sick, we provide them with care without making them pay. And it would be different. You know, if you were up here saying, I represent a class of Christian scientists, then you might be able to say, look, you know, why are they bothering me? But absent that, you're in this market. You're an economic actor. Well, Justice Kagan, once again, it depends on which market we're talking about. If we're talking about the health care insurance market... Well, we're talking about the health insurance market, which is designed to access the health care market. And with respect to the health insurance market that's designed to have payment in the health care market, everybody's not in the market. And that's the premise of the statute. That's the problem Congress is trying to solve. And if it tried to solve it through incentives, we wouldn't be here. But it's trying to solve it in a way that nobody's ever tried to solve an economic problem before, which is saying, you know, it would be so much more efficient if you were just in this market. But they're in the market in the sense that they're creating a risk that the market must account for. Well, Justice Kennedy, I don't think that's right certainly in any way that distinguishes this from any other context. When I'm sitting in my house deciding I'm not going to buy a car, I am causing the labor market in Detroit to go south. I am causing maybe somebody to lose their job and for everybody to have to pay for it under welfare. So the cost shifting that the government tries to uniquely associate with this market, it's everywhere. And even more to the point, the rationale that they think ultimately supports this legislation that, look, it's an economic decision. Once you make the economic decision, we aggregate the decision. There's your substantial effect on commerce. That argument works here. It works in every single industry. Of course, we do know that there are a few people more in New York City than there are in Wyoming who never will buy a car. But we also know here, and we don't like to admit it, that because we are human beings, we all suffer from the risk of getting sick, and we also all know that we'll get seriously sick. And we also know that we can't predict when. And we also know that when we do, there will be our fellow taxpayers through the federal government who will pay for this. If we do not buy insurance, we will pay nothing. And that happens with a large number of people in this group of 40 million, none of whom can be picked out in advance. Now, that's quite different from the car situation, and it's different in only this respect. It shows there is a national problem, and it shows there is a national problem that involves money, cost, insurance. So if Congress could do this, should there be a disease that strikes the United States, and they want everyone inoculated, even though 10 million will be hurt? It's hard for me to decide why that isn't interstate commerce, even more so, where we know it affects everybody. Well, Justice Breyer, there are other markets that affect everyone, transportation, food, burial services, though we don't like to talk about that either. There also are situations where there are many economic effects from somebody's failure to purchase a product. And if I could talk about the difference between the health insurance market and the health care market, I mean, ultimately, I don't want you to leave here with the impression that anything turns on that, because if the government decided tomorrow that they've come up with a great — some private companies come up with a great new wonder drug that would be great for everybody to take, would have huge health benefits for everybody, and, by the way, also, if everybody had to buy it, it would facilitate economies of scale, and the production would be great, and the price would be cheaper, and force everybody in the health care market to buy the wonder drug. I'd be up here making the same argument. I'd be saying that's not a power that's within the commerce power of the federal government. It is something much greater, and it would have been much more controversial. That's one of the important things. In Federalist 45, Madison says the commerce power, that's a new power, but it's not one anyone has any apprehension about. The reason they didn't have any apprehension about it is because it's a power that only operated once people were already in commerce. You see that from the text of the clause. The first kind of commerce Congress gets to regulate is commerce with foreign nations. Did anybody think the fledgling republic had the power to compel some other nation into commerce with us? Of course not. And in the same way, I think if the framers had understood the commerce power to include the power to compel people to engage — Well, once again, though, who's in commerce and when are they in commerce? If the effect of all these uninsured people is to raise everybody's premiums, not just when they get sick, if they get sick, but right now in the aggregate. And Wickard and Raich tell us we should look at the aggregate. And the aggregate of all these uninsured people are increasing the normal family premium, Congress says, by $1,000 a year. Those people are in commerce. They're making decisions that are affecting the price that everybody pays for this service. Justice Kagan, again, with all due respect, I don't think that's a limiting principle. My unwillingness to buy an electric car is forcing up the price of an electric car. If only more people demanded electric car, there'd be economies of scale and the price would go down. No, this is very different, Mr. Clement, and it's different because of the nature of the health care service, that you are entitled to health care when you go to an emergency room, when you go to a doctor, even if you can't pay for it. So the difference between your hypotheticals and the real case is the problem of uncompensated care. Justice Kagan, first of all, I do think this is not the only place where there's uncompensated care. If I don't buy a car and somebody goes on welfare, I'm going to end up paying for that as well. But let me also say that there's a real disconnect, then, between that focus on what makes this different and the statute that Congress passed. If all we were concerned about is the cost sharing that took place because of uncompensated care in emergency rooms, presumably we have before us a statute that only addressed emergency care and catastrophic insurance coverage. But it covers everything, soup to nuts and all sorts of other things. And that gets at the idea that there's two kinds of cost shifting that are going on here. One is the concern about emergency care and that somehow somebody who gets sick is going to shift costs back to other policy areas. But holders. But there's a much bigger cost shifting going on here. And that's the cost shifting that goes on when you force healthy people into an insurance market precisely because they're healthy, precisely because they're not likely to go to the emergency room, precisely because they're not likely to use the insurance they're forced to buy in the health care insurance. That creates a huge windfall. It lowers the price of premiums. And, again, this isn't just some lawyer up here telling you that's what it does and trying to second-guess the congressional economic decisions. This is Congress's findings. Findings, aye. On page 43A of the appendix to the government. All right. But all that sounds like you're debating the merits of the bill. You asked, really, for limiting principles so we don't get into a matter that I think has nothing to do with this case. Broccoli. Okay? And the limiting principles, you've heard three. First, the solicitor general came up with a couple, joined, very narrow ones. You've seen in Lopez this court say that we cannot, Congress cannot get into purely local affairs, particularly where they're noncommercial. And, of course, the greatest limiting principle of all, which not too many accept, so I'm not going to emphasize that, is the limiting principle derived from the fact that members of Congress are elected from states and that 95 percent of the law of the United States is state law. That is a principle, though enforced by the legislature. The other two are principles, one written into Lopez and one you just heard. It seems to me all of those eliminate the broccoli possibility, and none of them eliminates the possibility that we're trying to take the 40 million people who do have the medical costs, who do affect interstate commerce, and provide a system that you may like or not like. That's where we are in limiting principles. Let me take them in turn. I would encourage this Court not to Garcia-ize the Commerce Clause and just simply say it's up to Congress to release the Commerce Clause. So I don't think that is a limiting principle. Second of all — That's exactly what Justice Marshall said in Gibbons. He said that it is the power to regulate. The power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations. Well, other than those prescribed in the Constitution. But there is no conscription set forth in the Constitution with respect to regulating commerce. I agree 100 percent. And I think that was the Chief Justice's point, which was once you open the door to compelling people into commerce based on the narrow rationales that exist in this industry, you are not going to be able to stop that process. I would like to hear you address Justice Breyer's other two. Well, the other two principles are Lopez. And this case really is not — I mean, you know, Lopez is a limit on the affirmative exercise of people who are already in commerce. The question is, is there any other limit to people who aren't in commerce? And so I think this is the case that really asks that question. And then the first point, which was — I take it to be the Solicitor General's point — is, with all due respect, simply a description of the insurance market. It's not a limiting principle, because the justification for why this is a valid regulation of commerce is in no way limited to this market. It simply says these are economic decisions. They have effect on other people. My failure to purchase in this market has a direct effect on others who are already in the market. That's true of virtually every other market under this Congress. And now maybe return to Justice Sotomayor's question. I'd be delighted to, which is — I mean, you're absolutely right. Once you're in the commerce power, this Court's not going to police that subject maybe to the Lopez limit. And that's exactly why I think it's very important for this Court to think seriously about taking an unprecedented step of saying that the commerce power not only includes the power to regulate, prescribe the rule by which commerce is governed, the rule of Gibbons against Ogden, but to go further and say it's not just prescribing the rule for commerce that exists, but it is the power to compel people to enter into commerce in the first place. I'd like to say two very brief things about the taxing power, if I could. There are lots of reasons why this isn't a tax. It wasn't denominated a tax. It's not structured as a tax. If it's any tax at all, though, it is a direct tax. Article I, Section 9, Clause 4 — framers would have had no doubt that a tax on not having something is not an excise tax, but a forbidden direct tax. That's one more reason why this is not proper legislation, because it violates that. The second thing is, I would urge you to read the license tax case, which the Solicitor General says is his best case for why you ignore the fact that a tax is denominated into something other, because that's a case where the argument was that because the federal government had passed a license, not a tax, that somehow that allowed people to take actions that would have been unlawful under state law, that this was some special federal license to do something that was forbidden by state law. This Court looked beyond the label in order to preserve federalism there. What the Solicitor General and the government ask you to do here is exactly the opposite, which is to look past labels in order to upend our basic federalist system. And — Would you tell me, do you think the states could pass this mandate? I represent 26 states. I do think the states could pass this mandate, but I — Is there any other area of commerce, business, where we have held that there isn't a concurrence power between the state and the federal government to protect the welfare of commerce? Well, Justice Sotomayor, I have to resist your premise, because I didn't answer yes, the states can do it because it would be a valid regulation of intrastate commerce. I said yes, the states can do it because they have a police power. And that is the fundamental difference between the states on the one hand and the limited and enumerated federal government on the other. Thank you. Mr. Clement? Mr. Carvin? Thank you, Mr. Chief Justice. May it please the Court, I'd like to begin with the Solicitor General's main premise, which is that they can compel the purchase of health insurance in order to promote commerce in the health market because it will reduce uncompensated care. If you accept that argument, you have to fundamentally alter the text of the Constitution and give Congress plenary power. It simply doesn't matter whether or not this regulation will promote health care commerce by reducing uncompensated care. All that matters is whether the activity actually being regulated by the Act negatively affects commerce or negatively affects commerce regulation so that it's within the commerce power. If you agree with us that this exceeds commerce power, the law doesn't somehow become redeemed because it has beneficial policy effects in the health care market. In other words, Congress does not have the power to promote commerce. Congress has the power to regulate commerce. And if the power exceeds the permissible regulatory authority, then the law is invalid. Surely regulation includes the power to promote. So since the New Deal, we've said regulation is a market in agricultural products. Congress has the power to subsidize, to limit production, all sorts of things. Absolutely, Chief Justice, and that's the distinction I'm trying to draw. When they're acting within their enumerated power, then obviously they're promoting commerce. But the Solicitor General wants to turn it into a different power. He wants to say we have the power to promote commerce, to regulate anything to promote commerce. And if they have the power to promote commerce, then they have the power to regulate everything, right? I don't think you're addressing their main point, which is that they're not creating commerce in health care. It's already there. And we're all going to need some kind of health care, most of us will, at some point. I'd like to address that in two ways, if I could, Mr. Chief Justice. In the first place, they keep playing mix and match with the statistics. They say 95 percent of us are in the health care market, okay? But that's not the relevant statistic even of the government frames of the issue. No one in Congress or the Solicitor General is arguing that going to the doctor and fully paying him creates a problem. The problem is uncompensated care. And they say the uncompensated care arises if you have some kind of catastrophe, hit by a bus, have some prolonged illness. Well, what is the percentage of the uninsured that have those sorts of catastrophes? We know it's got to be a relatively small fraction. So, in other words, we don't know who they are. We don't. No, and we don't know in advance, but that doesn't change the basic principle, that you are nonetheless forcing people for paternalistic reasons to go into the insurance market to insure against risk that they have made the voluntary decision that they have decided not to. But the problem is that they are making the rest of us pay for it, because as much as they say, well, we're not in the market, we don't know the time and when they will be. And the figure is how much more families are paying for insurance because people get sick, they may have intended to self-insure, they haven't been able to meet the bills for cancer, and the rest of us end up paying because people are getting cost-free health care. And the only way to prevent that is to have them pay sooner rather than later, pay up front. Yes, but my point is this, that, with respect, Justice Ginsburg, conflicts the people who do result in uncompensated care, the free riders. Those are people who default on their health care payments. That is an entirely different group of people, an entirely different activity than being uninsured. So the question is whether or not you can regulate activity because it has a statistical connection to an activity that harms commerce. And my basic point to you is this, the Constitution only gives Congress the power to regulate things that negatively affect commerce or commerce regulation. It doesn't give them the power to regulate things that are statistically connected to things that negatively affect commerce. I was just going to say, because if they have that power, then they obviously have the power to regulate everything, because everything in the aggregate is statistically connected to something that negatively affects commerce, and every compelled purchase promotes commerce. In your view right there, I'm just picking on something. If it turned out there was some terrible epidemic sweeping the United States, and we couldn't say that more than 40 or 50 percent, I can make the number as high as I want, but you'd say the federal government doesn't have the power to get people inoculated, to require them to be inoculated, because that's just statistical. Well, in all candor, I think Morrison must have decided that issue, right? Because people who commit violence... Is your answer to that yes or no? Oh, I'm sorry. My answer is no, they couldn't do it because... The federal government has no power, and if there's terror... Okay, fine. Please turn to Justice Kagan. May I just please explain why? Violence against women obviously creates the same negative impression on fellow citizens as this communicable disease, and it has huge effects on the health care of our country. Congress found that it increased health care costs by... I agree with you that it had huge, big effects, but the majority thought that was a local matter. I think that's his point. I don't know why having the disease is any more local than beating up a woman, but my basic point is that, notwithstanding its very profound effect on the health care market, this court said the activity being regulated, i.e. violence against women, is outside the commerce clause power. So regardless of whether it has beneficial downstream effects, we must say no. Congress doesn't have that power. Why not? Because everything has downstream effects on commerce, and every compelled purchase promotes commerce. By definition, it helps the sellers and existing customers. Mr. Carvin, isn't there this difference between Justice Breyer's hypothetical and the law that we have before us here? In his hypothetical, the harm to other people from the communicable disease is the result of the disease. It is not the result of something that the government has done. Whereas here, the reason why there's cost shifting is because the government has mandated that. It has required hospitals to provide emergency treatment, and instead of paying for that through a tax which would be borne by everybody, it has required the — it has set up a system in which the cost is surreptitiously shifted to people who have health insurance and who pay their bills when they go to the hospital. Justice Alito, that is exactly the government's argument. It's an extraordinarily illogical argument. Well, I mean, if that's so, is it — let me just change my example under pressure and say that, in fact, it turns out that 90 percent of all automobiles driving interstate without certain equipment put up pollution which travels interstate. Not 100 percent. Maybe only 60 percent. Does the EPA have the power then to say you've got to have an anti-pollution device? It's statistical. What they can't do — yes, if you have a car, they can require you to have an anti-pollution device. Then you're not going on statistics. You're going on something else, which is what I'd like to know what it is. It's this. They can't require you to buy a car with an anti-pollution device. Once you've entered the market and made a decision, they can regulate the terms and conditions of the car that you do, and they can do it for all sorts of reasons. What they can't do is compel you to enter the market. Now you've changed the ground of argument, which I accept is totally legitimate. And then the question is, when you are born, and you don't have insurance, and you will, in fact, get sick, and you will, in fact, impose costs, have you, perhaps involuntarily, perhaps simply because you are a human being, entered this particular market, which is a market for health care? If being born is entering the market, then I can't think of a more plenary power Congress can have, because that literally means they can regulate every human activity from cradle to grave. I thought that's what distinguished the plenary police power from the very limited commerce power. I don't disagree that giving Congress plenary power to mandate property transfers from A to B would be a very efficient way of helping B and of accomplishing Congress's objective. I see the point. Go back to Justice Kagan. Don't forget her question. I've forgotten my question. I was facing the same dilemma, Justice Kagan. Well, let me ask the question that I asked Mr. Clement. It just seems— It's what it means to be the junior justice. It just seems very strange to me that there's no question we can have a social security system besides all the people who say, I'm being forced to pay for something I don't want. And this, which seems to me, to try to get care for the ones who need it, by having everyone in the pool, but it's also trying to preserve a role for the private sector, for the private insurers. There's something very odd about that. The government can take over the whole thing and we all say, oh, yeah, that's fine. But if the government wants to get to preserve private insurers, it can't do that. Well, I don't think the test of a law's constitutionality is whether it more adheres to the libertarian principles of the Cato Institute or the statist principles of someone else. I think the test of a law's constitutionality is not those policy questions. It's whether or not the law is regulating things that negatively affect commerce or don't. And since obviously the failure to purchase an item doesn't create the kind of effects on supply and demand that the market participants in Wickard and Raich did, and doesn't in any way interfere with regulation of the insurance companies, I don't think it can pass the basic... I thought that Wickard was, you must buy. We're not going to let you use the homegrown wheat. You have to go out in the market and buy that wheat that you don't want. Oh, but let's be careful about what they were regulating in Wickard, Justice Ginsburg. What they were regulating was the supply of wheat. It didn't in any way imply that they could require every American to go out and buy wheat. Yes, one of the consequences of regulating local market participants is it will affect the supply and the demand for the product. That's why you can regulate them, because those local market participants have the same effect on the interstate market that a black market has on the legal market. But none of that is true... In other words, you can regulate local bootleggers, but that doesn't suggest you can regulate teetotalers, people who stay out of the liquor market because they don't have any negative effect on the existing market participants or on regulation... Well, that's why I suggested, Mr. Carvin, that it might be different if you were raising an as-applied challenge and presenting a class of people whom you could say clearly would not be in the health care market. But you're raising a facial challenge, and we can't really know which of the many, many people that this law addresses in fact will not participate in the health care market and in fact will not impose costs on all the rest of us. So the question is, can Congress respond to those facts, that we have no crystal ball, that we can't tell who is and isn't going to be in the health insurance market, and say, most of these people will be, and most of these people will thereby impose costs on the rest of us, and that's a problem that we can deal with on a class-wide basis. No, again, the people who impose the costs on the rest of us are people who engage in a different activity at a different time, which is defaulting on their health care payment. It's not the uninsured. Under your theory, you could regulate anybody if they've got a statistical connection to a problem. You could say, since we could regulate people who enter into the mortgage market and impose mortgage insurance on them, we can simply impose the requirement to buy private mortgage insurance on everybody before they've entered the market, because we're doing it in this prophylactic way before it develops. No, no, I don't think that's fair, because not everybody is going to enter the mortgage market. The government's position is that almost everybody is going to enter the health care market. Two points, one of which Mr. Clements already made, which is the health insurance market is different than the health care market, but let me take it on full stride. I think everybody's in the milk market. I think everybody's in the wheat product market, but that doesn't suggest that the government compel you to buy five gallons of meat or five bushels of wheat, because they are not regulating commerce. Whether you're a market participant or not, they are still requiring you to make a purchase that you don't want to do. And to get back to your facial example... That's true of almost every product. I'm sorry? It's true of almost every product that's directly or indirectly by government regulation. The government says, borrowing my colleague's example, you can't buy a car without emission control. I don't want a car with emission control. It's less efficient in terms of the horsepower. But I'm forced to do something I don't want to do by government regulation. You are not forced to buy a product you don't want. And I agree with you that since the government regulates all markets, there is no limiting principle on their compelled purchase. When they put these environmental controls on the court... They force me to buy if I need unpasteurized goods, goods that don't have certain pesticides but have others. There is government compulsion in almost every economic decision because the government regulates so much. It's a condition of life that some may rail against, but... Let's think about it this way. Yes, when you've entered the marketplace, they can impose all sorts of restrictions on you. And they can impose, for example, all kinds of restrictions on states after they've enacted laws. They can wipe out the laws. They can condition them. But what can't they do? They can't compel states to enact laws. They can't compel states to carry out federal law. And I am arguing for precisely the same distinction because everyone intuitively understands that regulating participants after A and B have entered into a contract is fundamentally less intrusive than requiring A to... We let the government regulate the manufacturing process, whether or not the goods will enter into interstate commerce, merely because they might statistically. There's all sorts of government regulation of manufacturing plants, of agricultural farms, of all sorts of activity that will be purely interstate because it might affect interstate activity. I fully agree with you, Justice Sotomayor. So how is that different from saying you are self-insuring today, you're foregoing insurance? Why isn't that a predecessor to the need that you're eventually going to have? The cases you referred to I think effectively eliminated the distinction between participants in the interstate market vis-à-vis participants in the interstate market. None of those cases suggest that you can regulate people who are outside of the market on both an interstate and interstate level by compelling them to enter into the market. What about... You know, the simplest counterexample for me to suggest is you've undoubtedly read Judge Sutton's concurring opinion. He has about two pages, it seemed to me, of examples where everyone accepts the fact that under these kinds of regulations the government can compel people to buy things they don't otherwise want to buy. For example, he gives, even in that farm case, the farmer was being forced to go out and buy grain to feed to his animals because he couldn't raise it at home. You know, and he goes through one example after another. So what is your response to that, which you've read? Judge Sutton is wrong in each and every example. There was no compulsion in rage for him to buy wheat. He could have gotten wheat substitutes or he could have not sold wheat, which is actually what he was doing. There is a huge difference between conditioning regulation, i.e. conditioning access to the health care market and saying you must buy a product and forcing you to buy a product. I thought it was common ground that the requirement that the insurers, what was it, the community-based one, and they have to insure you despite your health status, they can't refuse because of preexisting conditions. The government tells us, and Congress determines, that those two won't work unless you have a pool that will include the people who are now healthy. But so, well, first, do you agree with your colleague that the community-based, and what's the name that they use for the other? Guaranteed issue. Yes. That that is legitimate commerce clause legislation? Oh, sure. And that's why, but we don't in any way impede that sort of regulation. These nondiscrimination regulations will apply to every insurance company, just as Congress intended, whether or not we buy insurance. Well, then what about the determination that they can't possibly work if people don't have to buy insurance until they are, their health status is such that the insurance company just dealt with them on its, as it will. You say, I won't insure you because you're already sick. It depends what you mean by work. It'll work just fine in ensuring that no sick people are discriminated against. But when you do that. But the sick people, why would they insure early if they're going to be protected if they get insurance late? Yeah, well, see, this is the government's very illogical argument. They seem to be saying, look, we couldn't just force people to buy insurance to lower health insurance premiums. That would be no good. But we can do it because we've created the problem. We, Congress, have driven up the health insurance premiums, and since we've created that problem, this somehow gives us authority that we wouldn't otherwise have. They can't possibly do it. Do you think that there's, what percentage of the American people who took their son or daughter to an emergency room and that child was turned away because the parent didn't have insurance, do you think there's a large percentage of the American population who would stand for the death of that child? They had an allergic reaction and a simple shot would have saved the child? One of the more pernicious misleading impressions that the government has made is that we are somehow advocating that people get thrown out of emergency rooms or that this alternative that they've hypothesized is going to be enforced by throwing people out of emergency rooms. This alternative, i.e., you condition access to health care on buying health insurance, is enforced in precisely the same way that the Act does. You either buy health insurance or you pay a penalty of $695. You don't have doctors throwing people out on the street Would you say the penalty is okay but not the mandate? I'm sorry, maybe I've misheard you. No, no, no. They create this straw man that says, look, the only alternative to doing it the way we've done it, if we condition access to health care on buying health insurance, the only way you can enforce that is making sick people not get care. I'm saying, no, no, there's a perfectly legitimate way they could enforce their alternative, i.e., requiring you buy health insurance when you access health care, which is the same penalty structure that's in the Act. There is no moral dilemma between having people have insurance and denying them emergency service. Congress has made a perfectly legitimate value judgment that they want to make sure that people get emergency care. Since the founding, whenever Congress has imposed that public responsibility on private actors, it has subsidized it from the federal treasury. It has not conscripted a subset of the citizenry and made them subsidize the actors who are being hurt, which is what they're doing here. They're making young, healthy people subsidize insurance premiums. Non-discrimination provisions have put on insurance companies. And that is the fundamental problem. So I want to understand the choices you're saying Congress has. Congress can tax everybody and set up a public health care system. Yes. That would be okay. Yes. Tax power is unlawful. Okay. Congress can or are you taking the same position as your colleague? Mr. Kelly, Congress can't say we're going to set up a public health system, but you can get a tax credit if you have private health insurance because you won't access the public system. Are you taking the same position, Mr. Kelly? There may have been confusion in your prior colloquy. I fully agree with my brother Clement that a direct tax would be unconstitutional. I don't think he means to suggest, nor do I, that a tax credit that incentivizes you to buy insurance creates problems. No, Congress incentivizes all kinds of activities. If they gave us a tax credit for buying insurance, then it would be our choice whether or not that makes economic sense. So how is that different than this act which says if a tax payer fails to meet the requirement of having minimum coverage, then they are responsible for paying the shared responsibility payment? The difference is that the taxpayer is not given a choice. It's the difference between banning cigarettes and saying I'm going to enforce that legal ban through a $5 a pack penalty and saying, look, if you want to sell cigarettes, fine, I'm going to charge you a tax of $5 a pack. I think that's what's happening, isn't it? No. I thought that everybody was paying, what is it, $10 a pack now? I don't even know the price. It's pretty high. Right. I think everybody recognizes that it's all taxation for the purposes of dissuading you to buy it. That's precisely my point. And everyone intuitively understands that that system is dramatically different than saying cigarettes tomorrow are illegal. It is different. It is different. It is different. I agree with that. But you pointed out, and I agree with you on this, that the government set up these emergency room laws. The government set up Medicaid. The government set up Medicare. The government set up CHIP. And there are 40 million people who don't have the private insurance. In that world, the government has set up commerce. It's all over the United States. And in that world, of course, the decision by the 40 million not to buy the insurance affects that commerce, and substantially so. So I thought the issue here is not whether it's a violation of some basic right or something to make people buy things they don't want, but simply whether those decisions of that group of 40 million people substantially affect the interstate commerce that has been set up in part through these other programs. So that's the part of your argument I'm not hearing. Please, it is clear that the failure to buy health insurance doesn't affect anyone. Defaulting on your payments to your health care provider does. Congress chose for whatever reason not to regulate the harmful activity of defaulting on your health care provider. They used the 20% or whoever among the uninsured as a leverage to regulate the 100% of the uninsured. I agree that that's what's happening here. And the government felt that that's because the insurance market is unique, and in the next case it will say the next market is unique. But I think it is true that if most questions in life are matters of degree, in the insurance and health care world, both markets, it's like two markets, the young person who's uninsured is uniquely, proximately very close to affecting the rates of insurance and the cost of providing medical care in a way that is not true in other industries. That's my concern in the case. And I may be misunderstanding you, Justice Kennedy. I hope I'm not. Sure, it would be perfectly fine if they allowed you do actuarial risk for young people on the basis of their risk for disease, just like you judge flood insurance on the homeowner's risk of flood. One of the issues here is not only that they're compelling us to enter into the marketplace, they're prohibiting us from buying the only economically sensible product that we would want, catastrophic insurance. Everyone agrees the only potential problem of the 30-year-old is he goes from the healthy 70% of the population to the unhealthy 5%. And yet Congress prohibits anyone over 30 from buying any kind of catastrophic health insurance. And the reason they do that is because they need this massive subsidy. Justice Alito, it's not our numbers. CBO said that injecting my clients into the risk pool lowers premiums by 15 to 20%. So, Justice Kennedy, even if we were going to create exceptions for people that are outside of commerce and inside of commerce, surely we would make Congress do a closer nexus and say, look, we're really addressing this problem. We want these 30-year-olds to get catastrophic health insurance. And not only did they, they deprived them of that option. And I think that illustrates the dangers of giving Congress these plenary powers because they can always leverage them. They can always come up with some public policy rationale that converts the power to regulate commerce into the power to promote commerce, which, as I was saying before, is the one that I think is plenary. Mr. Carbin, a large part of this argument has concerned the question of whether certain kinds of people are active participants in a market or not active participants in a market. And your test, which is a test that focuses on this activity-inactivity distinction, would force one to confront that problem all the time. Now, if you look over the history of the Commerce Clause, what you see is that there were sort of unhappy periods when the court used tests like this, direct versus indirect, commerce versus manufacturing. I think most people would say that those things didn't really work. And the question is, why should this test, inactive versus active, work any better? The problem you identify is exactly the problem you would create if you bought the government's bogus limiting principles. You'd have to draw distinctions between the insurance industry and the car industry and all that. Return you to the Commerce Clause jurisprudence that bedeviled the court before the 1930s, where they were drawing all these kinds of distinctions among industries, whereas our test is really very simple. Are you buying the product, or is Congress compelling you to buy the product? I can't think of a brighter line. And, again, if Congress has the power to compel you to buy this product, then obviously they've got the power to provide you, to compel you to buy any product, because any purchase is going to benefit commerce, and this Court is never going to second-guess Congress's policy judgments on how important it is, this product versus that product. Do you think that drawing a line between commerce and everything else that is not commerce is drawing an artificial line? It's drawing a line between commerce and manufacturing. The words inactivity and activity are not in the Constitution. The words commerce and non-commerce are. And, again, it's a distinction that comes, Justice Kagan, directly from the text of the Constitution. The framers consciously gave Congress the ability to regulate commerce because that's not a particularly threatening activity that deprives you of individual freedom. If you were required, if you were authorized to require, A, to transfer property to B, you have, as the early cases put it, a monster in legislation which is against all reason and justice, because everyone intuitively understands that regulating people who voluntarily enter into contracts and setting terms and conditions does not create the possibility of Congress compelling wealth transfers among the citizenry, and that is precisely why the framers denied them the power to compel commerce and precisely why they didn't give them plenary power. Thank you, Mr. Carvin. General Verrilli, you have four minutes remaining. Thank you, Mr. Chief Justice. Congress confronted a grave problem when it enacted the Affordable Care Act. Forty million Americans who can't get health insurance and suffer often very terrible consequences. Now, we agree, I think, everyone arguing this case agrees that Congress could remedy that problem by imposing an insurance requirement at the point of sale. That won't work. The reason it won't work is because people will still show up at the hospital or at their physician's office seeking care without insurance, causing the cost-shifting problem, and Mr. Clement's suggestion that they can be signed up for a high-risk pool at that point is utterly unrealistic. Think about how much it would cost to get the insurance when you are at the hospital or at the doctor. It would be unfathomably high. That will never work. Congress understood that. It chose the means that will work, the means that it saw work in the states, in the state of Massachusetts, and that it had every reason to think would work on a national basis. That is the kind of choice of means that McCullough says that the Constitution leaves to the democratically accountable branches of government. There is no temporal limitation in the Commerce Clause. Everyone subject to this regulation is in or will be in the health care market. They are just being regulated in advance. That's exactly the kind of thing that ought to be left to the judgment of Congress and the democratically accountable branches of government. And I think this is actually a paradigm example of the kind of situation that Chief Justice Marshall envisioned in McCullough itself, that the provisions of the Constitution needed to be interpreted in a manner that will allow them to be effective in addressing the great crises of human affairs that framers could not even envision. But if there's any doubt about that under the Commerce Clause, then I urge this Court to uphold the minimum coverage provision as an exercise of the taxing power. Under New York against the United States, this is a precisely parallel situation. The Court thinks there's any doubt about the ability of Congress to impose the requirement in 5000A sub A that can be treated as simply the predicate to which the tax incentive of 5000A sub B seeks accomplishment. And the Court, as the Court said in New York, has a solemn obligation to respect the judgments of the democratically accountable branches of government, and because this statute can be construed in a manner that allows it to be upheld in that way, I respectfully submit that it is this Court's duty to do so. Thank you. Thank you, General. Counsel, we'll see you tomorrow.